## Appeal of W. C. BRADLEY.                    Docket No. 47.

The transfer in 1919 by a corporation of stock or other property to a stockholder, in common with other stockholders and in proportion to stock held in the corporation, for one-eighth of its value and under other circumstances revealed by the evidence is not a sale in good faith but is a taxable dividend, when received by the stockholder, as defined by section 201(a) of the Revenue Act of 1918, and must be included in his net income subject to surtax for the year in question.

Submitted October 29, 1924; decided November 29, 1924.

*H. H. Swift, Esq.*, and *John E. McClure, Esq.*, for the taxpayer.

*John D. Foley, Esq.* (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

Before JAMES, STERNHAGEN, TRAMMELL, and TRUSSELL.

This appeal, involving additional personal income tax for the year 1919, was heard upon a stipulation of facts. The case relates to the sale of the stock of the Coca-Cola Co. of Georgia, the reorganization of that business as the Coca-Cola Co. of Delaware, and certain profits alleged to have grown out of this transaction.

### FINDINGS OF FACT.

The taxpayer, W. C. Bradley, was during the year 1919 a stockholder of the Trust Co. of Georgia, a banking corporation having its principal office and place of business in the city of Atlanta. He owned 50 shares of stock of the said corporation of a total of 10,000 shares issued and outstanding.

During the month of July, 1919, Ernest Woodruff, president of the Trust Co. of Georgia, hereinafter called the Trust Co., engaged Robert C. Alston to negotiate an option with each of the stockholders of the Coca-Cola Co. of Georgia, hereinafter called the Georgia Co., for the purchase of their stock in that company. At the same time Mr. Woodruff arranged with certain interests in New York for the formation of a syndicate, hereinafter called the Bankers' Syndicate, to cause to be incorporated under the laws of Delaware a corporation to be known as the Coca-Cola Co. of Delaware, hereinafter called the Delaware Co., to underwrite the purchase price of the stock of the Georgia Co.; to cause the property and assets of the latter company to be transferred to the former and to cause to be issued by the Delaware Co. $10,000,000 of preferred stock and 500,000 shares of no par value common stock, from the proceeds of the sale of which should be realized the sums necessary for the purchase of the stock of the Georgia Co. Mr. Woodruff agreed, on behalf of the Trust Co., that that company should have a 30 per cent interest in this syndicate and assume 30 per cent of the "responsibilities incurred in connection with the exercise of the said option."

On August 2, 1919, the board of directors of the Trust Co. adopted a resolution, the material portion of which is as follows:

*Be it resolved,* That this company do enter into the purchase of said participation certificates or of the assets of the Coca-Cola Co. through a syndicate or syndicates, provided the unanimous opinion of attorneys representing this company, the Guaranty Trust Co., the Chase Securities Co., and the Coca-Cola Co. is favorable; and further provided that one-half of the amount for which this company will be called upon to obligate itself in this behalf be underwritten by solvent persons, firms or corporations.

On or before August 8, 1919, Mr. Alston secured from all the stockholders of the Georgia Co. options to purchase their respective interests in that corporation. These options carried no obligation unless exercised, but if exercised required payments in the aggregate to the stockholders of the Georgia Co. of $10,000,000 preferred stock of the Delaware Co. and of $15,000,000 in cash. The options expired on August 29, 1919, and if exercised required payment of the purchase price 30 days after the acceptance of the option. On August 8, 1919, Mr. Alston assigned the said options to the Trust Co.

On August 13, 1919, the directors of the Trust Co. adopted a resolution authorizing the company to enter into the Bankers' Syndicate

to purchase the stock of the Georgia Co. to the extent of $4,500,000 and providing further as follows:

*Be it therefore resolved,* That the executive committee is authorized to propose to each of the stockholders of this company, that if he will deposit with this company, in cash, one hundred and ninety-five ($195) dollars for each share of stock owned by him in this company, to be used in assisting this company in financing said transaction, this company will divide with him the stock of the Coca-Cola Co., the Delaware corporation, retained by it under the original Bankers' Syndicate in proportion to his holdings, not to exceed one share of stock in the Coca-Cola Co. for each share of stock held by the stockholder in this company on the same basis at which this company acquired said stock, returning to said stockolders, upon the termination of said syndicate, the amount of money deposited by him, less the cost of the stock on the basis that this company acquired same.

*Be it further resolved,* That upon the assumption by him of a proportionate part of the liability of this company in committing itself to to a participation in the syndicate hereinbefore referred to, an interest in said syndicate to the extent of twenty thousand (20,000) shares of the stock of the Coca-Cola Co., the Delaware corporation, be transferred to Ernest Woodruff, in consideration of the time and services given by him in connection with this transaction.

On August 21, 1919, the Trust Co., the Newmont Co. of New York, the Shermar Investing Corporation and Charles H. Sabin, comprising the Bankers' Syndicate, formally executed a syndicate agreement whereby the parties obligated themselves to carry out the plan theretofore contemplated; to share the expenses, obligations, and profits in proportions therein named, the proportion of the Trust Co. being 30 per cent; to cause the Delaware Co. to be incorporated; to issue its stock as above set forth and to cause that company to sell to the syndicate 83,000 shares of its common stock at $5 per share and 417,000 shares to a separate syndicate, hereinafter called the Common Stock Syndicate, at $35 per share. On the same date the options theretofore secured to purchase the stock of the Georgia Co. were exercised, and the Common Stock Syndicate was organized by the Trust Co. to purchase 417,000 shares of the Delaware Co., with the Trust Co. acting as syndicate manager.

On August 22, 1919, the Trust Co. transmitted to the taxpayer and to all other stockholders of the company a letter reading, except as to name and amounts, as follows:

Mr. WILLIAM C. BRADLEY,
                    *Columbus, Ga.,*
DEAR SIR:

STRICTLY CONFIDENTIAL.

As you are probably aware, we, associated with strong New York interests, will share in the profits to be derived from the acquirement of the Coca-Cola Co. assets and business. This is a large transaction, involving a large sum of money, and we have made a large commitment in connection with the financing of the enterprise.

We made this commitment expecting to offer to our stockholders the privilege of participating in the profits of the enterprise on the same basis that the Trust Co. will share in such profits, provided such stockholders will contribute to the financing of the enterprise in proportion to the number of shares which they hold in the Trust Co.

It is impossible, at this time, to explain to you the details of the transaction, since they have not yet been definitely agreed upon and are subject to change, but it will be necessary to make the financial arrangements immediately and before the details can be worked out.

You hóld 50 shares of stock in the Trust Co., and, to enable you to participate in this transaction the amount of money it is necessary for you to place with us is $9,750. On the dissolution of the syndicate, which we anticipate

will not be later than October 1, you will be advised regarding its operation and a distribution promptly made.

We think it is to your interest to take advantage of this offer, and we recommend it to you. If we do not receive your check, however, for the amount above stated on or before 12 o'clock noon the 27th day of August, 1919, we will assume that you do not desire to participate.

The rights you acquire hereunder, if accepted, are not transferable before the dissolution of the syndicate.

Please sign the acceptance below, on the inclosed duplicate, and return with your check.

Yours very truly,

GEO. B. PENDLETON, *Treasurer.*

On August 23, 1919, the taxpayer by one J. D. Massey accepted the foregoing and forwarded his check for $9,750, being $195 per share on each of his 50 shares in the company, forwarding at the same time a letter reading as follows:

EAGLE & PHENIX MILLS,
*Columbus, Ga., August 23, 1919.*

TRUST CO. OF GEORGIA,
     *Atlanta, Ga.*

GENTLEMEN: Your circular letter of August 22, to Mr. W. C. Bradley, concerning the underwriting syndicate for handling the purchase of the Coca-Cola Co., has been received in the absence of Mr. Bradley on a business trip to New York.

Before leaving, Mr. Bradley went into this matter fully with me, and, anticipating that a call for funds might be made prior to his return, he instructed and fully empowered me to handle the matter for him in his absence.

You will accordingly find inclosed, as requested, the carbon copy of the above-mentioned letter from you, dated August 22, 1919, to which, by authority, I have signed Mr. Bradley's name, accepting for Mr. Bradley the offer of participation made in said letter.

Also further acting for Mr. Bradley, I attach hereto check of the W. C. Bradley Co., No. 1739, dated August 23, 1919, drawn upon the National City Bank, of New York, in favor of the Trust Co. of Georgia, for $9,750, same being the amount specified in the above-mentioned letter of August 22.

I know that it is Mr. Bradley's desire and intention to participate in this matter fully in all respects, and if there is anything else necessary to be done by him or for his account to that end, kindly communicate promptly by telegraph, telephone, or letter.

Yours, very truly,

J. D. MASSEY.

Immediately after August 21, and prior to August 26, 1919, the Trust Co., as syndicate manager of the Common Stock Syndicate, offered 417,000 shares of the Delaware Co. to the public on an " if, as, and when issued " basis at $40 per share, and on August 26, 1919, closed the subscription lists on account of such syndicate, the offer then being oversubscribed by 143,000 shares. On August 29, notices of the allotment of shares were sent common stock syndicate subscribers by the Trust Co. as syndicate manager, and on or before September 5, 1919, payments were received on the entire allotment of 417,000 shares. On the same date the Delaware Co. was duly organized.

On September 8, 1919, the Delaware Co., by resolution of its board of directors, authorized the sale, to persons not named, of 83,000 shares at $5 per share. On September 9, 1919, by resolution of the board of directors of the same company 417,000 shares of stock were sold to the Trust Co. as manager of the Common Stock Syndicate at $35 per share, payment therefor to be made on or before September 16, 1919.

On October 1, 1919, the taxpayer received from the Trust Co. its check for $9,500, 50 shares of common stock of the Delaware Co. of the value of $40 per share, and a letter reading as follows:

TRUST CO. OF GEORGIA,
*Atlanta, Ga., October 1, 1919.*

Mr. WILLIAM C. BRADLEY,
        *Columbus, Ga.*

DEAR SIR: Under date of August 22, 1919, we extended you an invitation to join us in the financing of the purchase of the Coca-Cola Co. of Atlanta.

You availed yourself of this invitation by placing with us $9,750. The deal has now been consummated and we are inclosing you treasurer's check for $9,500, covering the amount to be returned to you.

We are inclosing you herewith 50 shares Coca-Cola common stock, represented by
        Voting Trust Certificate No. TWO–34
          "       "       "       "
issued in your name which, as the result of your participation, we are able to sell you at $5 per share and we have deducted $250 from the funds mentioned above to cover the purchase price of the shares.

Please sign and return to us the carbon copy accompanying this letter, also our participation receipt which was issued to you when you made this payment.

We are glad to have had you with us in this transaction. The result has been gratifying to us and we trust that it is equally so to you.

And now may we add a personal word to you as a shareholder? Our company is doing well and forging ahead steadily. It is the ambition of the officers to make the Trust Co. of Georgia the greatest financial institution in the South, and with your help we can do it.

Considering our strength and the liberal interest we pay, our deposits are not large and we need your assistance in building them up. Let us have the benefit of any funds for which you have no immediate use. Open with us an inactive account. We will pay you 3 per cent thereupon. On certificates of deposit, payable on demand, we will pay the same rate, and on time certificates, running for a period of three months or longer, 4 per cent. On savings deposits we allow 4 per cent.

If you already have funds on deposit with us, be assured of our appreciation. Speak to your friends regarding us and invite them to make use of the services we offer in our various departments.

        Yours very truly,

GEO. B. PENDLETON, *Treasurer.*

On July 9, 1924, the Commissioner advised the taxpayer that he had determined a deficiency of income tax to be due from him amounting to $1,921.78, of which the sum of $1,016.84 was due to the inclusion in taxable income of the taxpayer of the sum of $1,750 alleged gain, profit, or income derived from the transaction above set forth. From that determination the taxpayer brings this appeal.

### DECISION.

The determination of the Commissioner is approved, provided that the deficiency determined and computed by the Commissioner does not include normal tax upon the above sum of $1,750; otherwise the sum so computed, if any, as normal tax is disallowed and the balance of such deficiency is affirmed. Final decision of the Board will be settled on consent or on seven days' notice.

### OPINION.

JAMES: The taxpayer in this case contends that, stripped of all but the essential elements, the series of transactions whereby he acquired 50 shares of the stock of the Delaware Co. represented a mere

purchase by him of such shares from the Trust Co. for $250. The Commissioner contends that the taxpayer acquired such stock by virtue of participation in the Bankers' Syndicate, and since the stock was worth $40 per share he thereby realized a gain of the difference between the value of the stock so acquired and the cost of such stock to him.

In our view of the case neither position as actually presented to the Board is sound.

The chronological analysis of the steps taken in the flotation of the stock of the Delaware Co. as set forth in the foregoing findings of fact, discloses the following situation at the time Bradley received his letter from the Trust Co. on August 22d and sent his remittance on the 23d:

1. The Bankers' Syndicate had been formed and the sale of stock by the Delaware Co. in two lots, one of 83,000 shares at $5 and one of 417,000 shares at $35, had already been determined upon.

2. The option to complete the purchase of the stock of the Georgia Co. did not expire until September 20 and no present obligation to pay therefor existed either on the part of the Bankers' Syndicate or the Trust Co.

3. The purchase of 417,000 shares at $35 by the Common Stock Syndicate was arranged for with the Trust Co. as syndicate manager.

4. It was apparent that: (a) The Trust Co. would receive 24,900 shares of the $5 stock; (b) the stockholders of the Trust Co. would participate in the profit of the Trust Co. either directly or indirectly; (c) a distribution in kind of the syndicate stock would not require the registering *on the books of the Trust Co.* of a profit on the syndicate stock measured by the difference between its cost and its selling price.

Within five days after the Trust Co. sent its letter to Bradley and the other stockholders, it announced that the public had purchased at $40 a share all the shares of stock allotted to it at $35 a share, and hence the Bankers' Syndicate was definitely assured that its entire liability under its original commitments was limited to $5 a share on 83,000 shares of stock which was readily salable at $40 per share, as shown by the oversubscription in the Common Stock Syndicate.

It seems to us that we are dealing here, then, not with a purchase and sale of stock but with a plan arranged to avoid, if possible, two taxable profits under the Revenue Act of 1918, one to the Trust Co. on the sale of its Bankers' Syndicate stock, and the other to Bradley, if and when a dividend was declared of the extraordinary profit realized by such sale if made. This result was sought to be avoided by a distribution in kind. We are to inquire whether this plan meets the legal tests of avoidance or is merely ineffective evasion.

It is important to note that the Trust Co. on August 2 provided for participation by other parties in the risks and profits of the Bankers' Syndicate but that the resolution on August 13 and the letter to the stockholders dated August 22, after the allotment of the $5 stock, read together, do not in fact call for syndicate participants but set out quite another and a more attractive proposal. It was then known that the stock of the Bankers' Syndicate would cost $5 per share. It was proposed to the stockholders that they

deposit $195 for each share of stock held in the Trust Co., but "this company will divide with him the stock of the Coco-Cola Co. * * * *in proportion to his holdings* * * *returning to said stockholders, upon the termination of said syndicate, the amount of money deposited by him,* less the cost of the stock on the basis that this company acquired same." (Italics ours.)

This offer was dated August 22d; Bradley accepted it August 23d. *Three days later* the Common Stock Syndicate reported through this same Trust Co. as syndicate manager that the public subscription at $40 per share had been oversubscribed 143,000 shares. The absolute agreement to return the stockholders' money proffered in the resolution of the 13th and the letter of the 22d, read together, was clearly no empty promise; it was based upon a not surprising foreknowledge of events soon to happen. Not only by specific agreement of the Trust Co. but by the facts surrounding the flotation of the public stock it is clear that Bradley did not place any funds at the risk of the venture and that the deposit of $9,750 was the merest shadow cast in front of the real transaction, which was a distribution in kind of the common stock of the Delaware Co. to the stockholders of the Trust Co. By this plan, if success crowned the effort to avoid the tax, the Trust Co. would escape tax on the sale of the proceeds of its Bankers' Syndicate operation, and the stockholders could assert the claim made here that they were merely purchasers of securities and had made no profit at all. The stockholders were all offered participation—a natural and significant precaution—since if any were excluded those so excluded could properly and effectively, by virtue of their rights as stockholders to participate pro rata in the profits of the corporation, prevent the successful carrying out of the plan. To make assurance doubly sure the offer was held open until August 27, *the day after* the Common Stock Syndicate reported on the sale of the 417,000 shares.

It is clear also that, since the payment for the stock of the Georgia Co. was not required to be made until September 20, and the Common Stock Syndicate would receive the proceeds of the sale of the 417,000 shares long before that time, the Trust Co. was aware on August 22 (and, judging from the resolution, apparently also knew on August 13), that no funds of its own except $5 per share on 24,900 shares would be required for advances or for any other purpose in connection with its participation in the Bankers' Syndicate.

But, even if the above be so, is the transaction none the less beyond the reach of the tax collector by reason of the fact that Bradley did pay $5 to the Trust Co. on account of each share of Delaware Co. stock received by him? If it be true that this plan is adequate to this purpose, then all income taxation upon corporate dividends or distribution is at an end, for it is only necessary in order to avoid the tax upon the stockholder that the corporation contemplating a dividend purchase a suitable security, susceptible of division among its stockholders, and "sell" it to them for an inadequate price.

The law is not so easily defeated. It deals not alone with the form but with the substance of transactions, looks if necessary through the form to the substance, and predicates its findings upon realities rather than upon fictions.

Tax evasion is as old as the taxgatherer, and the would-be evader has not infrequently tested in the courts the product of his fertile brain. If his plan really avoids the tax, if he actually conducts his operations outside the scope of its effectiveness, his device is said to be avoidance and succeeds; if on the contrary he merely screens an operation by making it seem the thing it is not then he fails and suffers the consequences of failure. To this effect are many cases.

In the case of *Holly Springs Savings & Insurance Co.* v. *Supervisors of Marshall County*, 52 Miss. 281, the bank invested its available funds in United States Government bonds shortly before the assessment date and reconverted the bonds into cash shortly after that date. In deciding that such a plan although perfectly legal in itself was an evasion of tax and therefore ineffective, the court said:

> * * * We declare that when the capital of a banking institution, used throughout the year in the conduct of its business, is converted for a few days into Government securities for the express purpose of defeating the imposition of any or all taxes, such investment is colorable and fraudulent, and its capital remains taxable to the same extent and in the same manner as if such conversion had never taken place. In such case the tenure by which they are held, being a fraud and a cheat, will be disregarded, and the bankers will be cons'dered as still the owners of that property which for the moment they have attempted to hide beneath the protection of the General Government.

Under like circumstances and under similar facts, the Supreme Court of the State of Illinois in *Re People's Bank of Vermont, Illinois,* 67 N. E. 177, said:

> While such institutions have the right to invest in such securities, and courts are bound to recognize that right, when it becomes a question between them and the State, and that question relates to the purpose of the purchase, and the facts tend to show that such purpose was the evasion of taxation, then the courts may look upon such transaction as none other than fraudulent in law and of such character that the beneficiaries can not be allowed, under the cloak of an apparent legitimate transaction, to thus avoid their duty and responsibility to the State.

In *Pollard* v. *First National Bank of Newton, Kansas,* 28 Pac. 202, the supreme court of that State held that where a banking corporation transferred $40,000 of its surplus to stockholders' account by a resolution in form declaring a dividend, but in fact providing a mere allocation of surplus by reason of the fact that the so-called dividend was required to be retained in the hands of the bank, it was held that the transaction was a subterfuge to avoid taxation and that an assessment in which was included the said value of $40,000 as part of the capital and surplus of the bank was valid.

Many cases might be cited to the same general effect of which particular note may be made of *People ex rel. Carman* v. *Sawyer,* 27 N. Y. Supp. 202, and *Ransom* v. *City of Burlington,* 82 N. W. 427.

A case of more than ordinary interest is *Durham* v. *State ex rel. Anderson,* 32 N. E. 104. This case arose in the State of Indiana, action having been begun in the name of the State against Durham to recover a penalty for evading taxation of personal property. It appears that Durham temporarily converted a portion of an open deposit account in the First National Bank of Crawfordsville into United States currency just prior to April 1, 1888, and reconverted it into the bank deposit just subsequent to that date. The property

was assessable in Indiana as of April 1 of each year, the penalty sought to be recovered being one imposed under the following provision of Indiana law (section 6339, Rev. St. 1881) :

If any person or corporation shall * * * temporarily convert any part of his personal property into property not taxable, for the fraudulent purpose of preventing such property from being listed, and of evading the payment of taxes thereon, he or it shall be liable to a penalty of not less than $50, nor more than $5,000, to be recovered in any proper form of action, in the name of the State of Indiana, on the relation of the prosecuting attorney.

In upholding the imposition of the penalty the court says:

It seems to be sufficiently clear that the complaint sets forth a state of facts constituting a fraudulent attempt against the collection of the public revenue provided for by law, and shows conduct on the part of the appellant punishable by penalty, as prescribed by the statute.

Three significant cases of tax evasion have been passed upon by the Supreme Court of the United States. In *David H. Mitchell* v. *The Board of County Commissioners of Leavenworth, Kansas*, 91 U. S. 206, there was involved the question of a temporary conversion of a bank deposit into United States currency. The taxing officers assessed the amount so converted nothwithstanding the fact of conversion, and the taxpayer, Mitchell, filed a bill of equity seeking to restrain collection of the tax. Being defeated in the Supreme Court of Kansas he sued out a writ of error to the Supreme Court of the United States. The court in sustaining the decree of the Supreme Court of Kansas said:

We think the decision in this case was correct. United States notes are exempt from taxation by or under State or municipal authority; but a court of equity will not knowingly use its extraordinary powers to promote any such scheme as this plaintiff devised to escape his proportionate share of the burdens of taxation. His remedy, if he has any, is in a court of law.

In *Stewart B. Shotwell* v. *Samuel A. Moore*, 129 U. S. 596, the same state of facts was before the court as in the case of *Mitchell* v. *Leavenworth County*, supra. The taxpayer instead of being assessed, was sued for the tax in the courts of the State of Ohio and was therefore in a court of law and not in a court of equity in bringing this case to the Supreme Court. The case is decided primarily under the provisions of the Ohio statute which imposed the tax on personal property on the basis of the average amount held during the year rather than upon the amount on any particular day. The device adopted by the taxpayer was here ineffective for the reason that he converted the securities only for a short period. It appears, however, that the court was fully prepared to dispose of the case merely upon the question of evasion, if necessary, and in indicating that conclusion said:

* * * the courts look upon this transaction as indefensible, and consider it an improper evasion of the duty of the citizen to pay his share of the taxes necessary to support the Government which is justly due on his property.

In *George D. Horning* v. *District of Columbia*, 254 U. S. 135, Horning was convicted of carrying on the busines of a pawnbroker in the District of Columbia without a license. It appears from the testimony that Horning, with intent to evade the laws of the District, opened an office at the south end of one of the bridges across the

Potomac River where he conducted negotiations respecting loans and received pledges on account of loans made. He maintained an office and storehouse in Washington where pledges were stored and redelivered to pledgors upon the payment of the loans and from which free automobile transportation was provided to the office in Virginia. In holding that that was an unsuccessful attempt to evade the District laws, Mr. Justice Holmes says:

It is said with reference to the charge of the judge, to which we shall advert, that there was a question for the jury as to the defendant's intent. But we perceive none. There is no question that the defendant intentionally maintained his storehouse and managed his business in the way described. It may be assumed that he intended not to break the law, but only to get as near to the line as he could, which he had a right to do; but if the conduct described crossed the line, the fact that he desired to keep within it will not help him It means only that he misconceived the law.

The evidence in this case shows that the Trust Co. was both a member of the Bankers' Syndicate and manager of the Common Stock Syndicate; that on August 21 the Bankers' Syndicate became assured of the ultimate possession of 83,000 shares of $5 stock of which the Trust Co. would secure 24,900: that on August 22 the Trust Co. proposed to *all its stockholders* the deposit with it of $195 for each share of its stock held by them with a promise in effect to return $190 and one share of common stock of the Delaware Co.; that that offer was held open to the stockholders until August 27; that the taxpayer did deposit $9,750 under this arrangement on August 23; that on August 26 the Trust Co., as manager of the Common Stock Syndicate, revealed to all the world that the common stock of the Delaware Co. was oversubscribed at $40 per share to the extent of 143,000 shares and no syndicate funds except $5 per share on 83,000 shares would be required to finance the acquisition of the stock of the Georgia Co.; that on or before September 5 all the common stock subscriptions allotted were paid for; that the Delaware Co. duly carried out the syndicate arrangements and that payment on account of the purchase of the stock of the Georgia Co. was not required under the options theretofore taken until September 20. Under these circumstances the alleged purchase of 50 shares of Delaware Co. stock at $5 by the taxpayer from the Trust Co. was no purchase at all, but a mere distribution of the assets of that company to him as a stockholder therein, he sharing with all the others as was his right as a stockholder.

The stock so received by the stockholder was income and is defined by section 201(a) of the Revenue Act of 1918 as a dividend as follows:

That the term " dividend " when used in this title  *  *  *  means  *  *  * any distribution made by a corporation  *  *  *  to its shareholders or members, whether in cash or in other property  *  *  *.

The determination of the Commissioner that there is a deficiency in income tax of this taxpayer for the year 1919 must be approved unless in the computation of such deficiency he has subjected the sum of $1,750 income to normal tax for the said year, in which event the computation must be modified by subjecting the said sum to surtax alone.